1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SUSAN CHAN,                              )   Case No. CV-06-6678 JC
                                         )
                    Plaintiff,           )
                                         )   MEMORANDUM OPINION
          v.                             )
                                         )
MICHAEL J. ASTRUE,[1]                    )
Commissioner of Social                   )
Security,                                )
                                         )
                    Defendant.           )

## I.    SUMMARY

On October 24, 2006, plaintiff Susan Chan ("plaintiff") filed a Complaint seeking review of the Commissioner of Social Security's denial of benefits. The parties have filed a consent to proceed before a United States Magistrate Judge.

This matter is before the Court on the parties' cross-motions for summary judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion"). The Court has taken both motions under submission without oral argument. See Fed. R. Civ. P. 78; L.R. 7-15; October 30, 2006 Case Management Order, ¶ 5.

///

---

[1]Michael J. Astrue is substituted as Commissioner of Social Security pursuant to Fed. R. Civ. P. 25(d)(1).

Based on the record as a whole and the applicable law, the decision of the Commissioner is AFFIRMED.  The finding of the Administrative Law Judge ("ALJ") that plaintiff failed without justifiable cause to follow prescribed treatment which was clearly expected to restore her ability to perform substantial gainful activity is supported by substantial evidence and is free from material error.[2]

## II.   BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On or about February 17, 2005, plaintiff filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB"). (Administrative Record ("AR") 68-75).  Plaintiff asserted that she became disabled on January 5, 2004, due to myasthenia gravis (grave muscle weakness), difficulty talking and swallowing, double vision, inability to sustain use of the arms and legs, fatigue, drooling, difficulty breathing, headaches, neck pain, and droopy eyelids.  (AR 68, 74, 76-77, 85).  The ALJ examined the medical record and heard testimony from plaintiff (who was represented by counsel) and a vocational expert.  (AR 401-30).  On January 27, 2006, the ALJ determined that although plaintiff was otherwise disabled due to her myasthenia gravis, she was not entitled to DIB payments, and was not eligible for SSI payments because plaintiff unjustifiably failed to follow a treating physician's prescribed treatment which was clearly expected to restore her ability to perform substantial gainful activity.  (AR 24, 25, 26).

The Appeals Council denied plaintiff's application for review of the ALJ's decision.  (AR 5-7).

---

[2]The harmless error rule applies to the review of administrative decisions regarding disability.  See Batson v. Commissioner, 359 F.3d 1190, 1196 (9th Cir. 2004) (applying harmless error standard); see also Stout v. Commissioner, 454 F.3d 1050, 1054-56 (9th Cir. 2006) (discussing contours of application of harmless error standard in social security cases).

1  **III.    DISCUSSION**

2      **A.    Standard of Review**

3         Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of

4  benefits only if it is not supported by substantial evidence or if it is based on legal

5  error.  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir.

6  2006) (citing Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1457

7  (9th Cir. 1995)).  Substantial evidence is "such relevant evidence as a reasonable

8  mind might accept as adequate to support a conclusion."  Richardson v. Perales,

9  402 U.S. 389, 401 (1971) (citations and quotations omitted).  It is more than a

10  mere scintilla but less than a preponderance.  Robbins, 466 F.3d at 882 (citing

11  Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990)).

12         To determine whether substantial evidence supports a finding, a court must

13  "'consider the record as a whole, weighing both evidence that supports and

14  evidence that detracts from the [Commissioner's] conclusion.'"  Aukland v.

15  Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting Penny v. Sullivan, 2 F.3d

16  953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming

17  or reversing the ALJ's conclusion, a court may not substitute its judgment for that

18  of the ALJ.  Robbins, 466 F.3d at 882 (citing Flaten, 44 F.3d at 1457).

19      **B.    Applicable Law**

20         A claimant who would otherwise be disabled within the meaning of the

21  Social Security Act ("SSA") may be denied benefits if she fails to follow

22  prescribed treatment without justifiable cause.  Roberts v. Shalala, 66 F.3d 179,

23  183 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996); Social Security Ruling

24  ("SSR") 82-59; 20 C.F.R. §§ 404.1530, 416.930.[3]  The claimant is deemed to have

25  "failed" to follow prescribed treatment only where all of the following conditions

26  _____

27       [3]Social Security rulings are binding on the Administration.  See Terry v. Sullivan, 903
28  F.2d 1273, 1275 n.1 (9th Cir. 1990).  Such rulings reflect the official interpretation of the Social
Security Administration and are entitled to some deference as long as they are consistent with the
Social Security Act and regulations.  Massachi v. Astrue, 486 F.3d 1149, 1152 n.6 (9th Cir.
2007).

1   exist:  (1) the evidence establishes that the impairment precludes engaging in any

2   substantial gainful activity; (2) the impairment has lasted or is expected to last for

3   twelve continuous months from onset of disability or is expected to result in death;

4   (3) treatment which is clearly expected to restore capacity to engage in any

5   substantial gainful activity has been prescribed by a treating source; and (4) the

6   evidence of record discloses that there has been refusal to follow prescribed

7   treatment.  SSR 82-59.  Where the SSA makes a determination of "failure," a

8   determination must also be made as to whether or not failure to follow prescribed

9   treatment is justifiable.  SSR 82-59.

10         An individual's failure to follow prescribed treatment is generally accepted

11   as "justifiable," inter alia:  (1) when the prescribed treatment is contrary to the

12   teachings and tenets of the claimant's religion; (2) when the prescribed treatment

13   is cataract surgery for one eye but the loss of visual efficiency in the other eye is

14   severe and cannot be corrected through treatment; (3) in an unusual case in which

15   a claimant's fear of surgery is so intense and unrelenting that it is, in effect, a

16   contraindication to surgery;[4] (4) when the claimant is unable to afford the

17   prescribed treatment which she is willing to accept, but for which free community

18   resources are not reasonably available; (5) when any duly licensed treating

19   medical source who has treated the claimant advises against the prescribed

20   treatment; (6) when major surgery for the condition in issue was previously

21   performed with unsuccessful results and additional major surgery is prescribed for

22   the same impairment; (7) when the prescribed treatment carries a high degree of

23   risk because of the enormity or unusual nature of the procedure (e.g., organ

24   transplant, open heart surgery); and (8) when the prescribed treatment involves

25   amputation of an extremity.  SSR 82-59; see also 20 C.F.R. §§ 404.1530, 416.930.

26

27         [4]If a treating source who had advised surgery later decides that the claimant's fear is so
great that she is not a satisfactory candidate for surgery, there is no issue of "failure."  SSR 82-

28   59.

4

The ALJ should give the claimant an opportunity to explain why she has failed to follow treatment, contact the treating physician to clarify the treatment the claimant was told to follow, and notify the claimant of the possibility of denial on this basis prior to her hearing.  <u>Roberts</u>, 66 F.3d at 183; SSR 82-59.

**C.    The ALJ's Findings Are Supported by Substantial Evidence and Are Free from Material Error**

Plaintiff challenges the ALJ's determinations in this case that (1) a thymectomy – a type of surgery prescribed by plaintiff's treating physicians – is clearly expected to restore her capacity to engage in substantial gainful activity; and (2) she refused to follow prescribed treatment without justifiable cause.

1.    <u>Whether Thymectomy Is Clearly Expected to Restore Plaintiff's Capacity to Engage in Substantial Gainful Activity</u>

In determining that the thymectomy prescribed by plaintiff's treating physicians was clearly expected to restore her capacity to engage in substantial gainful activity, the ALJ stated in pertinent part:

> Pursuant to [SSR] 82-59, I find that treatment clearly expected to restore capacity to engage in substantial gainful activity was prescribed by a treating source.  On January 19, 2004, Dr. Al-Wardi advised [plaintiff] to have a thymectomy (Exhibit 1F, p. 8) [AR 179].  At Long Beach Memorial on January 9, 2004, medical personnel wrote:
>
> > "Patient showed benefit of thymectomy since onset is early and young in age"
>
> (Exhibit 2F, p. 3) [AR 195].  On May 28, 2004, Dr. Buxton wrote:
>
> > "I have encouraged her to see Dr. Donald Mulder of Cardiothoracic Surgery as <u>thymectomy is now relatively indicated in all patients under age 65 with no significant</u>

5

1           <u>operative risk with myasthenia gravis as it quite</u>

2           <u>frequently can induce remission</u>"

3 (Exhibit 5F, p. 13) [AR 229] (emphasis added by ALJ).

4       Because [plaintiff] did not want to see the surgeon, Dr. Buxton

5 recommended "disease modulating medication rather than simply

6 symptomatic therapy with Meniston" (*id.*).  On June 28, 2004, when

7 [plaintiff] reported that she was unable to tolerate Prednisone, Dr.

8 Buxton indicated that in the absence of surgery, "CellCept or Imuran

9 will be considered" (Exhibit 5F, p. 10) [AR 226].  On November 1,

10 2004, Dr. Buxton wrote:

11           "She has not seen Dr. Mulder of cardiothoracic surgery

12           because she is adamantly opposed to surgery.  I have

13           expressed to her in the past <u>that this may help put her</u>

14           <u>disease in remission</u>"

15 (Exhibit 5F, p. 7) [AR 223] (emphasis added by ALJ).  Dr. Buxton

16 also documented:

17           "We discussed the possibility of immunosuppressant

18           agents, but as she is afraid of the flu this year she has

19           refused such"

20 (Exhibit 5F. p. 7) [AR 223].

21 (AR 24).

22       Plaintiff argues that Dr. Buxton's statement that "thymectomy is now

23 relatively indicated" is not an assurance of recovery from myasthenia gravis.

24 (Plaintiff's Motion at 6).  She notes that Dr. Buxton repeatedly stated that the

25 surgery <u>only could or may</u> put her disease in remission.  (Plaintiff's Motion at 6).

26 Plaintiff takes issue with the fact that Dr. Buxton did not definitively state that a

27 thymectomy <u>would</u> cure her impairment.  This argument is not persuasive.  The

28 relevant inquiry is whether the prescribed treatment will restore plaintiff's capacity

to work, not whether it will cure her impairment.  See SSR 82-59.  In fact, "[n]o

physician can guarantee the results of a major surgical procedure since any surgery

generally entails some degree of risk."  Id.  The consistent and unequivocal

recommendations for thymectomy by Dr. Buxton and other treating physicians

suggest that they strongly believed that the procedure would relieve, if not cure,

plaintiff's impairment.  See, e.g., AR 195 (progress notes dated January 9, 2004,

indicating that plaintiff was shown "benefit of thymectomy since onset is early and

young in age"); AR 223  (November 1, 2004 Dr. Buxton report that he "expressed

to [plaintiff] in the past that [thymectomy] may help put her disease in remission,

but she feels healthier now and is even less interested in surgery"); AR 229 (on

May 28, 2004, Dr. Buxton "encouraged [plaintiff] to see Dr. Donald Mulder of

Cardiothoracic Surgery as thymectomy is now relatively indicated in all patients

under 65 with no significant operative risk with myasthenia gravis as it quite

frequently can induce remission"); AR 302 (progress notes dated August 29, 2003,

indicating presence of  "palpable mass in neck" which "will require

thymectomy"); AR 305 (progress notes dated August 4, 2003, showing that "again

benefits of surgery explained"); AR 306 (progress notes dated August 18, 2003,

noting that plaintiff "again strongly recommended [to] consider thymectomy");

AR 307 (progress notes dated June 23, 2003, indicating that plaintiff informed of

"importance of early thymectomy").

        The ALJ properly considered the treating physicians' recommendations and

concluded that the surgery was expected to restore plaintiff's ability to work.  See

SSR 82-59 ("[T]he judgment as to whether prescribed treatment can be expected

to restore ability to work will be made by SSA.  In the event the treating source

states that prescribed treatment will restore ability to work, consideration should

be given to such opinion."); see also Magallanes v. Bowen, 881 F.2d 747, 750 (9th

Cir. 1989) (it is ALJ's responsibility to interpret evidence by determining

credibility and resolving conflicts and ambiguities in medical evidence).

1    Plaintiff also argues that her independent research demonstrates that a
2    thymectomy is not clearly expected to restore her ability to work.  This argument
3    lacks merit.  Plaintiff's contention rests on selected portions of a research report
4    that she submitted to the Appeals Council.  (AR 383-400).  Although the report
5    shows that the remission rate of patients who have undergone extended
6    thymectomy is 67.2% after 15 years (from the time of the surgery) and 50% after
7    20 years, the report also reveals that the palliation rate is 74% after 3 months and
8    90% after 3 years (with no significant decline thereafter).  (AR 383, 386-87).  The
9    report indicates that there is a high likelihood that a thymectomy will alleviate a
10   patient's myasthenia gravis.  As noted above, curing of the impairment is not
11   required.  Rather, the prescribed treatment must restore the claimant's ability to
12   work.  See SSR 82-59.  Thus, the research report is not inconsistent with the ALJ's
13   finding that the surgery is clearly expected to restore plaintiff's capacity to work.[5]

14   Based upon the foregoing, this Court concludes that the ALJ's finding that a
15   thymectomy is a prescribed treatment clearly expected to restore plaintiff's
16   capacity to engage in substantial gainful activity, is supported by substantial
17   evidence and is free from material error.

18                       2.    Whether Plaintiff Unjustifiably Refused to Follow the
19                             Prescribed Treatment

20   In finding no justifiable cause to support plaintiff's refusal to follow the
21   prescribed treatment, the ALJ noted, in relevant part, as follows:

22
23
24        [5]Plaintiff further fails to consider the report's assessment of the remission rate of patients
25   who were under the age of 35 when they underwent thymectomy.  Specifically, the remission rate
     of those patients is 75% after 15 years.  (AR 388).  Plaintiff, who was born on April 14, 1973,
26   falls within this age group.  The report shows that a patient's likelihood of full recovery is greater
     than that indicated by plaintiff.  Moreover, the report actually appears to support the use of
27   thymectomy as it concludes that "[e]xtended thymectomy is an excellent operative procedure for
     myasthenia gravis in both nonthymomatous and thymomatous patients."  (AR 384).
28

8

1    In the evidence, the only reason that [plaintiff] gives for

2    declining surgery is that she does not want a scar (Exhibit 9F, p. 38)

3    [AR 305].[6]  [Plaintiff] testified, however, that she declines a

4    thymectomy because while hospitalized in 1996, her father died from

5    a [staph] infection.  But at Garfield Medical Center, [plaintiff]

6    described her father as having "died of multiple illnesses and

7    complications" (Exhibit 1F, p. 7) [AR 178].  And to Dr. Lee, she

8    reported that her father had diabetes, hypertension and heart disease

9    (Exhibit 12F,

10   p. 35) [AR 364].  [Plaintiff's] only impairment is myasthenia gravis;

11   no doctor has identified a concurrent medical condition that would

12   increase the operative risk.  In addition, there is no evidence that

13   [plaintiff] raised her concerns to her doctors and allowed them to

14   address her reluctance.  She refuses even to see Dr. Mulder, the

15   cardiothoracic surgeon.  Furthermore, [plaintiff] worked in a hospital,

16   suggesting that she is familiar and comfortable with the setting.

17   On questioning by her attorney, [plaintiff] stated that her

18   biggest fear is that the surgery will be unsuccessful.  She testified that

19   based on her internet research, the chances of success are sixty

20   percent.  There is no evidence that she mentioned this percentage to

21   any of the doctors she is willing to see, much less Dr. Mulder, who

22   she declines to see.  And although [plaintiff] refused Dr. Buxton's

23   recommendation of immunosuppressants, she had been willing to take

24   Prednisone.  According to the Complete Guide to Prescription and

25   Non-Prescription Drugs (H.W. Griffith 2004) p. 14, Prednisone is an

26

27   _____

28   [6]Although plaintiff denies that she told any physician that she declined surgery because she did not want a scar, any error by the ALJ in pointing to such medical report is harmless.

9

1    adrenocorticoid which drugs are "[u]sed for their anti-inflammatory

2    and immunosuppressive effect."  Having agreed to take an

3    immunosuppressant earlier, I do not understand [plaintiff's]

4    unexplained refusal to take an immunosuppressant agent

5    subsequently.  This especially surprises me since these drugs may

6    enable [plaintiff] to avoid, or at least postpone, surgery.

7         I advised [plaintiff] that the decision to undergo the

8    thymectomy is hers alone, but that her refusal to have the surgery may

9    affect her eligibility for benefits of payments.  She did not indicate

10   that she wanted to reconsider her refusal.

11        I find no justifiable reason for [plaintiff's] failure to follow

12   prescribed treatment.  I find no evidence that the acceptance of the

13   prescribed treatment would be contrary to the teachings and tenets of

14   [plaintiff's] religion.  There is no evidence that [plaintiff's] treating

15   physicians have decided [] that [plaintiff's] fears are so great that she

16   is not a satisfactory candidate for surgery or that a treating physician

17   has advised [plaintiff] against the treatment prescribed.  [Plaintiff's]

18   physicians have not indicated that the treatment carries a high degree

19   of risk; to the contrary, they advised her because she is young and the

20   onset of the disease is early, she enjoys a greater likelihood of success

21   (Exhibit 2F, p. 3) [AR 195].

22        Based on the foregoing, I find that [plaintiff] does not have a

23   good reason for failing to follow treatment as prescribed by a treating

24   source and that the treatment is expected to restore her ability to

25   engage in substantial gainful activity.  Accordingly, [SSR] 82-59

26   directs a finding of "not disabled."

27   (AR 25).

28   ///

10

Plaintiff raises numerous challenges to the ALJ's finding that plaintiff did not have justifiable cause for failing to follow the prescribed treatment. (Plaintiff's Motion at 7-10). First, plaintiff contends that, contrary to Dr. Buxton's statement, a thymectomy carries significant risk given that it is performed under general anesthesia and she has a history of allergic reactions to pain medication and anti-inflammatory steroid medication. (Plaintiff's Motion at 7). Plaintiff argues that the ALJ never specifically discussed plaintiff's risk in light of her history. (Plaintiff's Motion at 7). The Court finds this argument unavailing.

Although the thymectomy carries some risk, the level of risk involved is not commensurate with that of a treatment that may be justifiably refused. See SSR 82-59 (failure to follow prescribed treatment justified when it carries "a high degree of risk because of the enormity or unusual nature of the procedure (e.g., organ transplant, open heart surgery)"). Indeed, none of the treating physicians suggested that the surgery would carry significant risk. Notably, Dr. Buxton was aware of plaintiff's allergies to Vicodin and Prednisone, and yet opined that plaintiff should undergo the thymectomy. (AR 222-23, 228-29). In fact, Dr. Buxton noted that plaintiff was a good candidate for the procedure. (AR 229).

Second, plaintiff argues that the thymectomy presented an unacceptable rate of success in light of the risk involved. (Plaintiff's Motion at 7-9). In support of her argument, plaintiff cites to the aforementioned research report purportedly indicating that the surgery has only a 50% remission rate and provides only temporary recovery. (Plaintiff's Motion at 7). As discussed above, the report also reveals that the surgery is highly likely to alleviate her myasthenia gravis (i.e., palliation rate is 90% after 3 years). (AR 386-87). Given that the relevant issue is whether the prescribed treatment will restore plaintiff's capacity to work, not whether it will cure her impairment, the report does not support plaintiff's argument that her chances of success were "unacceptable." See SSR 82-59. Notably, plaintiff never expressed her concerns to her treating physicians. In fact,

11

1  the treating physicians indicated that plaintiff would likely benefit from the

2  procedure.  (See, e.g., AR 195, 223, 229, 302, 305-07).

3       Third, plaintiff contends that the surgery was elective and she was unable to

4  afford such treatment.  (Plaintiff's Motion at 7-8).  This argument similarly fails.

5  As noted above, a claimant is generally deemed to be justified in failing to follow

6  prescribed treatment when she is unable to afford the prescribed treatment she is

7  willing to accept, but for which free community resources are not reasonably

8  available.  SSR 82-59.  Plaintiff does not allege that she is or was willing to accept

9  even a free thymectomy.  To the contrary, she seems adamant in her refusal to

10 undergo such a procedure.  Moreover, at the hearing, plaintiff admitted that she

11 never discussed with her physicians whether free community resources were

12 available.  (AR 415-16).  Plaintiff's failure to represent that she would be willing

13 to undergo a free thymectomy, and her failure even to inquire about free or

14 subsidized treatment belies her suggestion that her financial situation was the basis

15 upon which she declined to have the surgery, or was even a factor in her decision.

16      Fourth, plaintiff argues that she feared being hospitalized after the surgery

17 because "nurses don't understand what Myasthenia is and how it affects [her]" and

18 her father died from a staph infection contacted at a hospital.  (Plaintiff's Motion

19 at 8).  As noted above, a claimant may be deemed to have just cause to refuse

20 prescribed treatment in an unusual case in which a claimant's fear of surgery is so

21 intense and unrelenting that it is, in effect, a contraindication to surgery.  SSR 82-

22 59.  Generally, an opinion from a treating source is required to substantiate a

23 claimant's fears "so great that [she] is not a satisfactory candidate for surgery."[7]

24 _____

25      [7]"Where the claimant fears undergoing prescribed surgery, the treating physician should
   be informed of this fact and asked about his or her current recommendation(s) for treatment. . .
26 Where fear of surgery is suggested to be extreme, but the treating source has limited contact with
   the person and is unable to indicate the significance of the fear, an independent examination by a
27 psychiatrist may be warranted as a means of resolving whether the fear contraindicates surgery."

28                                                        (continued...)

SSR 82-59.  None of the treating physicians suggested any significant doubt on plaintiff's candidacy for the surgery.  In fact, the treatment notes are bereft of any complaints made by plaintiff concerning her fears of undergoing the thymectomy.  The ALJ's determination that plaintiff's stated fears fail to constitute justifiable cause for rejecting the prescribed treatment is supported by substantial evidence.  See SSR 82-59 ("An individual may . . . attempt to justify refusal of surgery on the grounds of alleged personal or third party knowledge of persons who did not improve, or perhaps worsened, following surgery similar to that recommended to the individual by a treating physician.  However, such reason(s) for nonacceptance of surgical treatment will not, in and of itself, negate a finding of "failure.").[8]

---

[7](...continued)
SSR 82-59.  Plaintiff does not contend that the ALJ failed fully to develop the record in this, or in any other regard.

[8]Plaintiff also contends that she reasonably refused immunosuppressants because she feared being susceptible to the flu.  (Plaintiff's Motion at 9-10).  She alleges that the flu is a major concern to her given her difficulty coughing up phlegm and her prior hospitalization due to this problem.  (Plaintiff's Motion at 9).  She contends that she is awaiting the approval for a new drug, Monarson, and may use Intravenous Immune Globulin ("IVIG") infusions in the meantime.  (Plaintiff's Motion at 10).  This argument lacks merit.  As noted by the ALJ, plaintiff's inconsistent actions undermine her allegation that her increased susceptibility to contracting the flu was a justifiable cause for rejecting immunosuppressants.  Shortly after plaintiff began treatment with Prednisone, a medication which has an immunosuppressive effect, plaintiff was hospitalized, on January 18, 2004, due to bronchitis and possible pneumonia.  (AR 25, 175, 178, 182, 184, 195).  She reported that she is allergic to Prednisone as it irritated her stomach.  (AR 25, 175, 178, 182).  Then, on November 1, 2004, plaintiff refused treatment with immunosuppressants (i.e., CellCept or Imuran) based on her fear of contracting the flu.  (AR 223, 226).  However, on December 16, 2005, plaintiff reported that, in the prior month, she was hospitalized because she contracted pneumonia and suffered a seizure after receiving a Prednisone injection.  (AR 368-69).  Hence, plaintiff was unwilling to take CellCept or Imuran but yet took Prednisone during the flu season.  Notably, plaintiff refused the immunosuppressants even after the flu season, when she would have been less susceptible to the flu.  Even after plaintiff refused the immunosuppressants, plaintiff was advised to undergo alternative treatment but did not do so.  (AR 369).  Specifically, on December 16, 2005, plaintiff was advised to receive IVIG for her myasthenia gravis but as of the filing date of Plaintiff's Motion – March 1, 2007 – plaintiff has not undergone such treatment.

1    Based upon the foregoing, this Court concludes that the ALJ's finding that

2  plaintiff failed, without justifiable cause, to follow prescribed treatment, is

3  supported by substantial evidence and is free from material error.

4  **IV.    CONCLUSION**

5    For the foregoing reasons, Defendant's Motion is granted, and Plaintiff's

6  Motion is denied.

7    IT IS THEREFORE ORDERED that judgment be entered AFFIRMING the

8  decision of the Commissioner and dismissing this action with prejudice.

9    LET JUDGMENT BE ENTERED ACCORDINGLY.

10  DATED:  October 26, 2007

11

12    _____/s/_____

13    Honorable Jacqueline Chooljian
      UNITED STATES MAGISTRATE JUDGE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14